754 S.E.2d 905

**The STATE, Respondent,**

v.

**James ANDERSON, Appellant.**

**Appellate Case No. 2012–210188.**
**No. 5196.**

Court of Appeals of South Carolina.

Heard Sept. 10, 2013.
Decided Feb. 12, 2014.
Rehearing Denied March 21, 2014.

Appellate Defender Susan Barber Hackett, of Columbia, for Appellant.

Attorney General Alan McCrory Wilson and Assistant Attorney General John Benjamin Aplin, both of Columbia, for Respondent.

**WILLIAMS, J.**

James Anderson was convicted of first-degree burglary. On appeal, Anderson argues the trial court erred by qualifying a crime scene investigator as an expert in fingerprint analysis. In addition, Anderson claims the trial court erred in refusing to strike the investigator's testimony or, in the alternative, to grant a mistrial based on the State's failure to disclose fingerprint evidence favorable to him prior to trial. We affirm.

**FACTS/PROCEDURAL HISTORY**

During the week of July 4, 2009, Christian Vickery, Allen Smith, and Joseph Emming were vacationing with their families at the Blue Water Resort hotel in Myrtle Beach, South Carolina. On the night of July 8, 2009, their hotel suite was burglarized. Anderson was subsequently arrested for the crime and charged with first-degree burglary.

At trial, all three victims testified. Emming stated he was lying on the couch in the living room when he saw an African–American male pass through the kitchen into the living room. When Emming got off the couch, the perpetrator ran out the door. Emming unequivocally identified Anderson as the person he saw in the hotel suite during the burglary. Vickery testified that she and Smith were sleeping in one of the

bedrooms when the burglary occurred. Shortly after falling asleep, Vickery awakened and noticed her bedroom door and window were open, despite the door and window being closed when she went to sleep. Vickery stated she saw a black male outside the door to the suite. Smith testified Vickery awoke him and told him someone had been in their bedroom. He then reached down to put on his shorts, but his shorts and wallet were missing. Smith stated he never saw the perpetrator.

To connect Anderson to the crime, the State proffered Brad McClelland as an expert witness regarding fingerprint analysis and comparison. McClelland stated he was currently employed with the Federal Bureau of Prisons. However, at the time of the burglary, he worked as a crime scene investigator for the Myrtle Beach Police Department (MBPD). In support of his qualification as an expert, McClelland testified he had completed the following training: twelve hours of continuing education courses in forensic science and law; forty hours of training in basic fingerprint analysis with the South Carolina Law Enforcement Division (SLED); forty hours of private training in advanced palm print analysis in North Carolina; and an additional four-hour advanced fingerprint class administered by SLED in Columbia. He testified he became a certified Automated Fingerprint Identification System[1] (AFIS) examiner by passing a test administered by SLED in Columbia. McClelland explained his AFIS certification was based on a proficiency test that required comparing ten-print cards of known prints to unknown prints until he accurately matched all of the cards. Since becoming a certified AFIS examiner, McClelland had viewed 300 to 500 unknown fingerprints and correctly matched forty to fifty of those unknown prints.

---

1. Law enforcement fingerprints every person who is arrested in this state. *State v. Anderson*, 386 S.C. 120, 130, 687 S.E.2d 35, 40 (2009). SLED then receives and maintains these known prints on the arrestee's ten-print card in the condition in which it arrives. *Id.* The AFIS database stores all of the digital fingerprint images of every ten-print card in South Carolina. *Id.* When a latent fingerprint is found at a crime scene, law enforcement can analyze this print by running it through AFIS to determine whether the recovered print matches any prints in the AFIS database. *Id.* at 130, 687 S.E.2d at 39.

Anderson objected to McClelland's qualification as an expert, arguing he lacked adequate experience and disputing whether McClelland had the "proper schooling" to make him an expert in fingerprint analysis. Upon further examination by the trial court, McClelland testified that the subject of the classes he took was fingerprint comparison identification. He confirmed he had not previously been qualified by a court as an expert in fingerprint identification. McClelland had previously been asked to provide expert testimony; however, those cases never went to trial. Ultimately, the trial court qualified McClelland as an expert witness. In making this determination, the trial court found the sufficiency of McClelland's education and validity of his conclusions were matters for the jury after proper instructions on the role of expert testimony in the case.

After the State's proffer of McClelland's testimony and the trial court's ruling, McClelland testified before the jury. According to McClelland, he responded to the scene of the burglary and lifted fingerprints from the inside of the windowsill. McClelland stated he ran the best print through AFIS, requested a list of thirty known prints with similar characteristics, and was ultimately able to find a known print identical to the fingerprint left on the windowsill.

On cross-examination, McClelland was questioned about obtaining fingerprints from the windowsill and submitting a print through the AFIS identification process. McClelland testified that AFIS does not return actual fingerprint matches. According to McClelland, the examiner requests anywhere between ten and fifty responses. AFIS then returns a list of fingerprints that are similar to the unknown fingerprint, and the examiner must then physically review each potential matching print and compare it with the latent print from the crime scene.

McClelland testified that in the instant case, he analyzed the subject fingerprint points,[2] entered the points into AFIS, and at his request, the system returned thirty fingerprints that contained similar points to the subject fingerprint. McClelland stated he did not analyze all thirty prints because the

---

2. McClelland testified the term "points" includes the ridge endings, bifurcations, dots, and other minute details of each fingerprint.

second print he examined contained eleven matching points. In his opinion, the matched print was identical to the subject print, and the probability the print belonged to someone other than the person he identified was zero.

According to McClelland, the MBPD required all matched prints be verified by another examiner. In this case, Officer Ioni examined and verified the match. On redirect, McClelland testified he was confident the print he lifted from the crime scene matched the known print generated on AFIS. Marilyn Sanders, AFIS coordinator and SLED fingerprint examiner, subsequently confirmed that the known print in AFIS belonged to Anderson.

In light of McClelland's testimony, Anderson argued outside the jury's presence that "[he] never received any information that there were thirty hits from the AFIS computer, nor did [he] receive the fingerprints of those thirty individuals to look and compare and to determine how close some of the other individuals were on there." Anderson further argued that while the summary of results and the matched print were provided to him, the twenty-nine unmatched prints were not provided to him. In response, the State argued it produced everything in its possession, including a printed AFIS screenshot listing the identification numbers from the thirty fingerprint results. Upon query from the trial court, the State clarified it never printed nor produced the thirty individual results, only the summary of results. The State also acknowledged that only law enforcement officers could view and compare the fingerprint results on AFIS, and accordingly, Anderson could not have obtained the print outs of the other identified prints on his own.

The trial court framed Anderson's argument as a claim that Anderson was entitled to the twenty-nine identified but unmatched prints to do his own analysis to determine whether those prints were exculpatory. The trial court noted that to grant relief for a discovery violation, Anderson would have to show there is a probability that exculpatory evidence, if produced, would have brought about a different result at trial. The trial court found there was no proof of the existence of exculpatory evidence and the State complied with the rules of criminal procedure by giving Anderson the AFIS results

screenshot and the matched print result. The trial court then denied Anderson's motion to exclude the fingerprint analysis evidence.

Upon completion of the State's case, Anderson renewed his motion to strike McClelland's fingerprint testimony. Anderson argued he was prejudiced by the omission of the documents because McClelland admitted he stopped reviewing the thirty fingerprint results after the second print contained eleven matching points. According to Anderson, one or more of the other potential matching fingerprints could have contained more matching points and, therefore, were potentially exculpatory. In the alternative, Anderson made a motion for a new trial. The State responded that no discovery violation occurred because it provided the printout summary of the thirty fingerprints and Anderson could have requested these printouts. The trial court agreed and denied Anderson's motions.

Anderson testified in his own defense. He stated he frequently went to the Blue Water Hotel to visit friends. Anderson believed he had been there hundreds of times, and he thought he had been in the same room shortly before the fingerprint was found. At the conclusion of Anderson's case, Anderson renewed his motions and the trial court denied the same.

After both closing arguments, the trial court charged the jury as follows:

The rules of evidence ordinarily do not permit witnesses to testify to opinions or conclusions. An exception to this rule exists for witnesses we call expert witnesses. A witness who, by education and experience, has become [an] expert in some art, science, profession or calling may state an opinion as to the relevant and material matter in which the witness claims to be an expert, and may also state the reasons for the opinion. You should consider any expert opinion received in this case and, like any other evidence, give it the weight you think it deserves. If you decide that the opinion of an expert witness is not based on sufficient education and experience or if you conclude that the reasons given in support of the opinion are not sound or that the opinion is outweighed by other evidence, you may disregard the opin-

ion entirely. An expert witness' testimony is to be given no greater weight than that of other witnesses simply because the witness is an expert. Further, you are not required to accept an expert's opinion, even though it is not contradicted.

After deliberations, the jury found Anderson guilty of first-degree burglary. The trial court sentenced Anderson to twenty-five years' imprisonment. This appeal followed.

## STANDARD OF REVIEW

In criminal cases, an appellate court sits to review only errors of law. *State v. McEachern*, 399 S.C. 125, 135, 731 S.E.2d 604, 608 (Ct.App.2012). " 'The admission or exclusion of evidence is left to the sound discretion of the trial [court], whose decision will not be reversed on appeal absent an abuse of discretion.' " *State v. Black*, 400 S.C. 10, 16, 732 S.E.2d 880, 884 (2012). " 'An abuse of discretion occurs when the trial court's ruling is based on an error of law or, when grounded in factual conclusions, is without evidentiary support.' " *State v. Jennings*, 394 S.C. 473, 477–78, 716 S.E.2d 91, 93 (2011).

## LAW/ANALYSIS

First, Anderson argues the trial court erred by qualifying McClelland as an expert in fingerprint analysis because McClelland lacked the requisite knowledge, skill, experience, training, and education to form an opinion and testify accordingly. We disagree.

The qualification of a witness as an expert and the subsequent admission of that witness's opinion testimony are matters within the sound discretion of the trial court. *State v. Price*, 368 S.C. 494, 498, 629 S.E.2d 363, 365 (2006). "There is no abuse of discretion as long as the witness has acquired by study or practical experience such knowledge of the subject matter of his testimony as would enable him to give guidance and assistance to the jury in resolving a factual issue which is beyond the scope of the jury's good judgment and common knowledge." *State v. Goode*, 305 S.C. 176, 178, 406 S.E.2d 391, 393 (Ct.App.1991). Absent an abuse of discretion amounting to an error of law, the trial court's ruling will not be disturbed on appeal. *State v. Weaverling*, 337 S.C. 460, 474, 523 S.E.2d 787, 794 (Ct.App.1999).

Rule 702 of the South Carolina Rules of Evidence, entitled "Testimony by Experts," provides:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

■ We hold the trial court properly qualified McClelland as an expert in fingerprint analysis pursuant to Rule 702. McClelland's experience as a crime scene investigator as well as his education and training demonstrate McClelland had acquired by "study or practical experience" the requisite knowledge to testify as an expert on the subject of fingerprint analysis and comparison. Through his experience and study, McClelland was better qualified than the jury to form an opinion on these topics. *See State v. Robinson,* 396 S.C. 577, 586, 722 S.E.2d 820, 825 (Ct.App.2012) ("To be competent to testify as an expert, a witness must have acquired by reason of study or experience or both such knowledge and skill in a profession or science that he is better qualified than the jury to form an opinion on the particular subject of his testimony.") (internal quotation marks omitted); *see also Goode,* 305 S.C. at 178, 406 S.E.2d at 393 (finding police officer qualified to testify as an expert on accident impact issue when officer received twelve weeks of training at highway department academy, spent one week in "on the road" training with police force, and had four to five months experience as a state trooper at time of the accident).

Second, Anderson argues the trial court erred by either refusing to strike the testimony concerning fingerprint analysis, or, in the alternative, refusing to declare a mistrial based upon the State's failure to provide individual printouts of all thirty fingerprints as required by *Brady v. Maryland.*[3] We disagree.

■ The *Brady* disclosure rule requires the prosecution to provide the defendant with any evidence in the prosecution's possession that may be favorable to the accused and material to guilt or punishment. *Hyman v. State,* 397 S.C. 35,

---

3. 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

45, 723 S.E.2d 375, 380 (2012). Favorable evidence is either favorable exculpatory evidence or favorable impeachment evidence. *United States v. Bagley,* 473 U.S. 667, 676, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). Materiality of evidence is based on the reasonable probability that the result of the proceeding would have been different had the evidence been disclosed to the defense. *Hyman,* 397 S.C. at 45, 723 S.E.2d at 380. A reasonable probability is shown when the government's evidentiary suppression undermines confidence in the outcome of the trial. *Id.* at 45–46, 723 S.E.2d at 380. Furthermore, the prosecution has the duty to disclose such evidence even in the absence of a request by the accused. *United States v. Agurs,* 427 U.S. 97, 107, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). Thus, an individual asserting a *Brady* violation must demonstrate the evidence was (1) favorable to the accused; (2) in the possession of or known by the prosecution; (3) suppressed by the State; and (4) material to the accused's guilt or innocence, or was impeaching. *Kyles v. Whitley,* 514 U.S. 419, 419, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995).

█ In our opinion, *Brady* does not require the State to turn over the unmatched prints to Anderson. In response to Anderson's discovery request, the State provided the AFIS results screenshot, which showed AFIS had produced thirty responses to McClelland's query. Anderson makes no showing that if he obtained the individual printouts of the unmatched fingerprints, they would constitute exculpatory or favorable impeachment evidence. Because the exculpatory value of the unmatched prints was entirely speculative, we find it does not fall within the rule enunciated by *Brady. See Agurs,* 427 U.S. at 109–10, 96 S.Ct. 2392 (holding the mere possibility that an item of undisclosed information may have been helpful to the defense in its own investigation is insufficient to establish constitutional materiality under *Brady* ). Accordingly, we hold the trial court did not err in this respect.

## CONCLUSION

Based on the foregoing, the trial court's decision is

**AFFIRMED.**

288

FEW, C.J., concurs.

KONDUROS, J., concurs in result only.